**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-00945-NYW

ANDREW RAZO,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

Magistrate Judge Nina Y. Wang

      This action comes before the court pursuant to Titles II and XVI of the Social Security

Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Commissioner of Social

Security's ("the Commissioner") final decision denying the application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") filed by Plaintiff Andrew Razo

("Plaintiff" or "Razo").  Pursuant to the Order of Reference dated April 7, 2015, this civil action

was referred to the Magistrate Judge for all purposes pursuant to the Pilot Program to Implement

the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. §

636(c).  [#25].  The court has carefully considered the Complaint filed on April 2, 2014 [#1],

Defendant's Answer filed on September 15, 2014 [#9], Plaintiff's Opening Brief filed on

December 29, 2014 [#16], Defendant's Response Brief filed on February 27, 2015 [#19], the

entire case file, the administrative record,[1] and applicable case law.  For the following reasons, the decision is AFFIRMED.

### STANDARD OF REVIEW

To provide context for the background of the case, the court will first address the standard of review.  A five-step evaluation process governs whether a claimant is disabled under the Act.  *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750.  In order, the Administrative Law Judge's ("ALJ") analysis proceeds as follows:

1. The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity.  A claimant who is working is not disabled regardless of the medical findings.

2. The ALJ must then determine whether the claimed impairment (which can be a combination of medical conditions) is "severe."  A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.

3. The ALJ must then determine if the impairment meets or equals in severity certain impairments described in Appendix 1 of the regulations.  If the ALJ determines that the impairment meets or equals in severity, then the analysis concludes and the claimant is determined to be disabled.

---

[1] *See* [#10-1 through #10-15 and #13] (the "Administrative Record" or "Record").  For consistency and ease of reference, this Order utilizes the docket number assigned by the Electronic Court Filing ("ECF") system for its citations to the court file.  For the Administrative Record, the court then refers to the page number associated with the Record as cited by the Parties, which is found in the bottom right-hand corner.  For documents outside of the Administrative Record, the court refers to the page number assigned in the top header by the ECF system.

4. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant can perform his past work despite any limitations.  In order to perform the analysis under step 4, the ALJ must first determine a claimant's residual function capacity, defined as her ability to do physical or mental work on a sustained basis, despite her impairments.  The assessment of residual function capacity must take into account all impairments, even if a particular impairment is not considered severe.

5. If the claimant does not have the residual functional capacity to perform her past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work in the economy. This determination is made on the basis of the claimant's age, education, work experience, and residual function capacity.

20 C.F.R. § 404.1520(b)-(f).  "The claimant bears the burden of proof through step 4 of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).  At step 5, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's "residual functional capacity, age, education, and work experience."  *Neilson*, 992 F.2d at 1120.

In reviewing the Commissioner's final decision, the court is limited to determining whether the ALJ applied the appropriate legal standards and supported his or her findings with substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Angel v. Barnhart,* 329 F.3d 1208, 1209 (10th Cir. 2003).  The court may not reverse an ALJ simply because she may have reached a different result, as the issue on appeal is whether the ALJ's findings were supported by substantial evidence in the record.  *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a

mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation and quotation omitted).  Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted).  The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Flaherty,* 515 F.3d at 1070 (internal citation and quotation omitted). Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## PROCEDURAL HISTORY AND BACKGROUND

### I.      Procedural History

Mr. Razo originally applied for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Act in December of 2007, alleging a disability onset date of August 31, 2005.  [#10-7 at 542-555].  On April 4, 2008, the Social Security Administration initially denied Plaintiff's application.  [#10-4 at 272-273].

On June 5, 2008, Mr. Razo filed a written request for a hearing.  [#10-5 at 340].  On October 22, 2009, a hearing was held before Administrative Law Judge Jon L. Lawritson (ALJ). [#10-3 at 264-271].  At that hearing, Mr. Razo requested that a closed period of disability running from August 31, 2005 to July 20, 2009 be considered, as Mr. Razo then stipulated to medical improvement subsequent to July 20, 2009.  [*Id.* at 266].  Because Mr. Razo planned to submit a narrative report from his hand surgeon on the day of the hearing that the state agency

physician had not yet had an opportunity to review, the ALJ adjourned the hearing and "postpone[d]" the case.  [*Id.* at 269].  On May 4, 2010, an additional hearing was held.  [*Id.* at 230-265].  Mr. Razo testified at the hearing, as did the Social Security Administration's Vocational Expert ("VE") Martin Rohrer.  [*Id.*].  On June 22, 2010, the ALJ issued an unfavorable decision, finding that Mr. Razo was not disabled from the alleged onset date through the date of decision.  [10-4 at 274-299].

Plaintiff subsequently requested that the Social Security Administration's Appeals Council review the ALJ's June 22, 2010 decision.  [#10-4 at 328-330].  On September 1, 2011, the Appeals Council vacated the ALJ's June 22, 2010 decision, and upon remand, directed the ALJ to, *inter alia*, consider the "indications of anxiety, opioid dependence, bilateral knee impairments and bilateral neuropathies" in the record (which included new materials submitted at the Appeals Council level).  [*Id.*].  The ALJ was also directed to "[o]btain evidence from a medical expert to clarify the nature and severity of claimant's impairments."  [*Id.* at 329].

On February 16, 2012, a hearing was held on remand.  [#10-3 at 195-197].  Mr. Razo testified, as did independent medical experts Alexander Rack, M.D. and Margaret Moore, Psy.D. Dr. Rack testified about Plaintiff's potential physical impairments and limitations, and Dr. Moore testified about Plaintiff's potential mental impairments.  [*Id.* at 195-229].  Because the ALJ determined that further medical expert testimony as to Mr. Razo's physical condition, impairments, and limitations was warranted, the ALJ adjourned the hearing.  [*Id.* at 227-28].

On July 24, 2012, Harold Greenberg, M.D. provided additional medical expert testimony concerning Plaintiff's physical impairments and limitations.  [#13 at 1588-1626].  The hearing was adjourned again, with additional testimony from Mr. Razo and another VE contemplated. [*Id.* at 1624-25].  On October 19, 2012, an additional hearing was held.  [#10-3 at 156-94].  Mr.

Razo testified, as did VE Deborah Christianson.  [*Id.*].  On November 9, 2012, the ALJ again issued an unfavorable decision, finding that Plaintiff was not disabled from the claimed onset date of August 31, 2005 to the date of decision.[2]  [#10-2 at 102-138].

Mr. Razo appealed.  [#10-2 at 1-5].  The Appeals Council then denied the Mr. Razo's request for review.  [*Id.*].  The ALJ's decision is final for purposes of this court's review.  20 C.F.R. § 404.981.

## II.     Plaintiff's Contentions of Error

Mr. Razo raises the following contentions of errors for review:  (1) the ALJ failed to apply the treating physician rule to the opinions of his hand surgeon, Mitchell Fremling M.D., with respect to Plaintiff's upper extremity impairments; (2) the ALJ failed to properly consider and making findings of fact as to purported non-exertional limitations—*i.e.*, according to Plaintiff, Mr. Razo's pain, need to take time off work, and obesity—in determining Mr. Razo's RFC; (3) the ALJ failed to assign any limitations with respect to Mr. Razo's social functioning in the ALJ's RFC determination; and (4) the ALJ erred at Step 5 in finding that there are jobs existing in substantial numbers in the national economy that Plaintiff could perform notwithstanding his functional limitations.  Mr. Razo acknowledges that an unfocused review medical records related to his assorted symptoms would be "unwieldy," and therefore, focuses his arguments on his alleged upper extremity and mental impairments.  [#16 at 12, 13-17]. Therefore, the court focuses its discussion on those impairments in this Opinion and Order, as

---

[2] While Mr. Razo initially limited his claim for disability to a closed period between August 31, 2005 to July 20, 2009, his later testimony, the ALJ's decision, and the briefing all appear to claim disability from the onset date of August 31, 2005 through the date of the ALJ decision, November 9, 2012.  The ALJ decision further notes that Mr. Razo meets the insured status requirements of the Social Security Act through December 31, 2010.  [#10-2 at 108].

they are at the core of Plaintiff's appeal, though it also addresses Mr. Razo's contentions of error related to his asserted non-exertional limitations.

## II.      The ALJ's Decision and Plaintiff's Core Contentions of Error

As noted above, the Social Security Administration utilizes a five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. § 416.920(a). The steps are followed in order, and if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step.

### A.      Plaintiff's Upper Extremity Impairments

At Step 2, the ALJ found that Mr. Razo's severe impairments included "bilateral upper extremity neuropathies." [#10-2 at 108].  At Step 3, the ALJ found that Plaintiff's upper extremity neuropathies did not, alone or in combination with Plaintiff's other impairments, equal a listed impairment. [*Id.* at 108-113].  At Step 4, the ALJ determined that Plaintiff RFC's would allow Plaintiff to lift and carry up to 10 pounds at least occasionally, and to frequently use his upper extremities for work activities, while noting that Plaintiff should never climb ladders, ropes, or scaffolds. [*Id.* at 113-114].

Mr. Razo contends that the ALJ erred in failing to give controlling weight to the October 2009 opinion of Dr. Fremling, a physician who treated Mr. Razo's upper extremity conditions before and after October of 2009, including several months prior by means of decompression surgery. [#16 at 21, 23-27].  In evaluating Mr. Razo's upper extremity impairments, the ALJ instead gave greater weight to the subsequent and less restrictive opinions of Dr. Graesser, Dr. Rack, and Dr. Greenberg. [#10-2 at 121-24].

**B.      Plaintiff's Mental Health Impairments**

At Step 2, the ALJ found that Mr. Razo's claimed anxiety disorder was a severe impairment.  [#10-2 at 108].   In determining what functional imitations if any this severe impairment posed to Mr. Razo's RFC at Step 4 , the ALJ gave "significant" weight to the opinions provided by Dr. Moore during the February 16, 2012 hearing.  [*Id.* at 124].  Dr. Moore opined that Mr. Razo had a personality disorder that would impose moderate limitations on Mr. Razo's ability to interact with supervisors, co-workers, and the general public as an employee. [*Id.*].  Dr. Moore also opined that Mr. Razo's social limitations would be most significant when Mr. Razo was confronted regarding potential substance abuse.   [*Id.*].   Because the ALJ determined that Mr. Razo's opiate dependence was in "full remission" as of at least June of 2011, and because the ALJ found that Mr. Razo himself had not indicated any difficulties with social functioning, the ALJ declined to assign any limitations related to Mr. Razo's mental health impairments in determining Mr. Razo's RFC.  [*Id.*].

Plaintiff contends that the ALJ erred by failing to support these findings with substantial evidence in the Record.  [#16 at 30-32].

**III.     Relevant Testimony**

**A.      May 4, 2010 Hearing**

On May 4, 2010, Plaintiff testified as to his work history and then alleged impairments to date.  [#10-3 at 230-263].  Mr. Razo testified that he was born on October 8, 1965, and that he had completed high school.  [*Id.* at 234].  Mr. Razo testified that his last employed  by the City of Boulder in a maintenance position in August of 2005.  [*Id.*].  Mr. Razo testified that he stopped working in this position due to the severity of his congestive heart failure.  [*Id.* at 235].

Mr. Razo testified that, at the time of his claimed disability onset in August 2005, he weighed over 350 pounds.  [*Id.* at 239].  Mr. Razo testified that he was five feet and ten inches tall.  [*Id.*].  Mr. Razo testified that, at some point subsequent to his claimed disability onset date, he lost over 100 pounds due to pancreatitis.  [*Id.*].  Mr. Razo also testified that, at the time of the hearing, he weighed 335 pounds.  [*Id.* at 252].

Mr. Razo testified that his right arm problems "probably" began in 2007 and persisted through the "first part" of 2009.  [*Id.* at 241].  Mr. Razo testified that, at the time of the hearing, he was experiencing some issues with pain and weakness in his upper left extremity.  [*Id.* at 248].  Mr. Razo noted that had had obtained at least some relief from a recent surgery on his right upper extremity.  [*Id.* at 249-51].  Mr. Razo testified that, at the time of the hearing, he could "probably" lift only less than 10 pounds without experiencing pain.  [*Id.* at 251].

Mr. Razo testified that after resolution of a number of physical maladies, including his pancreatitis and abdominal pain, he no longer had the need to take prescription pain medication at the time of the hearing.  [*Id.* at 246-47].  Mr. Razo also testified that he took Advil three times a day.  [*Id.*].

Mr. Razo testified that, subsequent to the claimed onset date in August of 2005, he had experienced problems with anxiety and panic attacks.  [*Id.* at 247-48].  According to Mr. Razo, these issues were in part related to "overwhelming domestic situations" and his "serious illnesses."  [*Id.*].  Mr. Razo indicated that, at the time of the hearing, his problems with stress and anxiety had been improving with time.  [*Id.* at 254].

### B.    February 16, 2012 Hearing

Upon remand, a hearing was held on February 16, 2012.  [#10-3 at 195-229].  Dr. Rack called upon to testify by the ALJ and provided testimony concerning Plaintiff's upper extremity

impairments.  [*Id.*].  Dr. Moore provided testimony concerning Plaintiff's mental impairments. [*Id.*].

Dr. Rack testified that, from his "specialty point of view" as a neurologist, there was "very little" present in Mr. Razo's medical records that Dr. Rack considered to be "of major significance."  [*Id.* at 200].  Although Dr. Rack declined to opine as to the significance of Mr. Razo's "general medical and orthopedic" impairments, Dr. Rack noted that his review of Mr. Razo's medical records indicated that Mr. Razo was "morbidly obese."  [*Id.* at 200-201].  Dr. Rack also testified that he did not doubt that Mr. Razo's morbid obesity might exacerbate a number of Mr. Razo's other impairments, including Mr. Razo's neuropathies and back problems. [*Id.* at 203].  Dr. Rack also testified that, although the surgeries to Mr. Razo's upper extremities might impose significant restrictions during the time necessary for recovery, the "nature" of the underlying upper extremity abnormalities treated would not preclude Plaintiff from "function[ing] in a fairly reasonable way."  [*Id.*].

Dr. Moore testified that, in her view based on review of Mr. Razo's medical records to date, his "major problem" in terms of mental impairment was addiction to prescription medications.  [*Id.* at 209].  Dr. Moore also provided a secondary diagnosis of personality disorder, which Dr. Moore based in part on indications in Mr. Razo's medical records of tumultuous domestic relations, and in part on indications in the medical records that Mr. Razo was dependent on prescription painkillers and anti-anxiety medications.  [*Id.* at 209-210].

Dr. Moore further testified that, in her view, Mr. Razo had "significant limitations" arising from his "personality issues," primarily in the "social realm."  [*Id.* at 211].  When asked whether these limitations would impair Mr. Razo's ability to interact appropriately with supervisors, co-workers, and the general public, Dr. Moore testified that "when he is at his worst

I think it is because he is being confronted about his substance abuse.  So again some moderate limitations in terms of the social factors with public and supervisors."  [*Id.*].

### C.      July 24, 2012 Hearing

On July 24, 2012, Dr. Greenberg provided testimony as a medical expert.  [#13 at 1590-1626].  Dr. Greenberg testified that, with the exception of periods of time for recovery from surgery that would not be anticipated to last more than a "couple" months, Mr. Razo would be able to lift 10 pounds occasionally.  [*Id.* at 1597].  Dr. Greenberg also testified that Mr. Razo would be able to "fairly frequently" use his upper extremities except during recovery periods. [*Id.* at 1599].  Dr. Greenberg testified that Mr. Razo would be capable of work involving sedentary levels of activity, and testified that greater levels of functional limitation reflected in an October 2009 opinion by Mr. Razo's treating surgeon Dr. Fremling may have reflected Mr. Razo's condition soon after surgical intervention, but were not warranted in light of the medical record as a whole except during periods of recovery from surgery.  [*Id.* at 1610-1612].

### D.      October 19, 2012 Hearing

On October 19, 2012, Mr. Razo and Vocational Expert Deborah Christianson ("Ms. Christianson") testified.  [#10-3 at 156-194].  Mr. Razo testified that he could "probably" only "less than 10 pounds" at a time for "not very long."  [*Id.* at 163].  Mr. Razo also complained of cramping in his hands.  [*Id.* at 163-64].  Mr. Razo testified that he would have difficulty opening a door if he needed to reach out to do so, and that he no longer had the strength to pinch small objects.  [*Id.* at 165].  Mr. Razo testified that, on a scale of 0 to 10, he would rate the pain in his right elbow as a "seven or eight."  [*Id.* at 182].  However, Mr. Razo also testified that, since 2008, his need for pain medication "really dwindled a lot."  [*Id.* at 177].

Mr. Razo testified that, during the course of a typical week, he would attend a counseling appointment for one hour, hand therapy for half an hour, and knee treatment for two hours. [*Id.* at 180]. Mr. Razo also testified that, since the claimed onset date, he would attend at least one medical appointment per week, and estimated that, on average, he would attend three or four. [*Id.* at 180-81].

Mr. Razo testified that his current weight was 325 pounds. [*Id.* at 166]. Mr. Razo also testified that his mental health was "worse" than it had been in 2010, although his problems with anxiety were the "same." [*Id.* at 174].

## III.   Relevant Medical History

### A.   Plaintiff's Upper Extremity Impairments

The following facts and opinions are gleaned from Plaintiff's medical records contained in the Administrative Record. On March 13, 2008, Mr. Razo reported hand pain during a visit to his physician Dr. Fanestil. [#10-11 at 959]. On March 18, 2008, Mr. Razo again visited Dr. Fanestil, chiefly complaining of problems with anxiety. [*Id.* at 960]. The treatment records indicate an ulnar nerve injury, and state that Mr. Razo's "5th finger" was "feeling somewhat better." [*Id.*].

On April 29, 2008, Mr. Razo visited Dr. J. William Wagner, a neurologist at Northwest Neurology, for a consultation regarding Mr. Razo's right upper extremity impairments, which apparently arose from a fall several months earlier. [#10-13 at 1159]. The treatment records indicate the Mr. Razo's right upper extremity strength was "normal proximally," and that his grip strength was "good." [*Id.* at 1160]. An electrodiagnostic study indicated reduced ulnar motor conduction in Mr. Razo's right elbow, proximally and distally reduced ulnar motor amplitudes, prolonged distal median sensory latency, and denervation of the right first dorsal interosseus.

[*Id.* at 1157].   The associated clinical impression was right carpal tunnel syndrome and right ulnar neuropathy.  [*Id.*].

On May 20, 2009, Mr. Razo again visited Dr. Wagner for a subsequent evaluation.  [*Id.* at 1156].   The treatment records state that Mr. Razo reported that the numbness in his right fifth finger was slowly improving.  [*Id.*].  Mr. Razo also reported that he did not have elbow pain and did not believe he had weakness in his right hand.  [*Id.*].   The June 2009 electrodiagnostic study results indicated reduced conduction velocity in Mr. Razo's right elbow, with prolonged wave latency and mildly reduced ulnar amplitudes.  [*Id.* at 1154].   Dr. Wagner's evaluative notes indicate a clinical impression of ulnar neuropathy at Mr. Razo's right elbow.  [*Id.*].

On June 23, 2009, Mr. Razo visited the emergency room at Avista Adventist Hospital complaining of pain in his right hand that Mr. Razo believed arose from his previously diagnosed ulnar nerve injury.  [*Id.* at 1162].   He reported tingling and decreased sensation in his right hand. [*Id.* at 1163].

On July 10, 2009, Mr. Razo underwent surgery performed by Dr. Fremling to his upper right extremity, including decompression of his ulnar nerve at the right elbow and a transposition of the ulnar nerve with step-out flexor muscles at the right forearm. [*Id.* at 1167-68].  In October of 2009, Dr. Fremling opined that Mr. Razo was limited to lifting less than 10 pounds frequently or occasionally.  [*Id.* at 1175-76].  Dr. Fremling also opined that Mr. Razo would be limited to reaching less than 5 pounds for less than 5 minutes per hour, to handling less than 10 pounds, to fingering less than 20 minutes per hour, and to pushing and pulling less than 10 pounds less than 20 minutes per hour.  [*Id.* at 1176].

On February 1, 2010, Mr. Razo visited Dr. Wagner for a follow-up appointment.  [*Id.* at 1261].   The treatment records reflect that Mr. Razo reported that although some numbness

remained in his right elbow, the pain had significantly decreased, and movement and strength had both improved in his right upper extremity. [*Id.*].  However, Mr. Razo also noted that since October of 2009, he had been experiencing numbness and shock sensations in his left elbow, pain and weakness in his left thumb, and weakness in his left hand. [*Id.*]. The treatment records indicate an initial clinical impression of left ulnar neuropathy or carpal tunnel syndrome.  [*Id.*]. A February 2010 electrodiagnostic study included findings of prolonged left distal median sensory latency, mildly slowed left ulnar conduction velocity, and mildly prolonged left ulnar f-wave latency.  [*Id.* at 1263].

On February 2, 2010, Mr. Razo underwent a neurological evaluation performed by Kristin Graesser, M.D.  [*Id.* at 1233-1236].  Dr. Graesser noted some weakness in Mr. Razo's right hand.  [*Id.* at 1234-35].  Dr. Graesser noted that Mr. Razo was experiencing "some improvement" due to surgery and with other therapy. [*Id.* at 1235]. Dr. Graesser opined that Mr. Razo would be able to lift or carry objects of up to 50 pounds occasionally.  [*Id.*].  In the accompanying medical source statement, Dr. Graesser opined that Mr. Razo could lift objects up to 50 pounds frequently.  [*Id.* at 1237-42].  Dr. Graesser also opined that Mr. Razo could carry objects of up to 20 pounds frequently, and up to 50 pounds occasionally.  [*Id.*].  At that time, the clinical finding is reflected as "right hand weakness."  [*Id.*]

On or before April 12, 2010, Dr. Fremling determined that surgery on Mr. Razo's left upper extremity was appropriate.  [*Id.* at 1259-60].  On May 21, 2010, Mr. Razo underwent surgery to his left upper extremity including an endoscopic carpal tunnel release, radial tunnel release, and cubital tunnel release with submuscular transposition of the left ulnar nerve.  [*Id.* at 1269-70].

On June 3, 2010, Mr. Razo visited Dr. Fremling for a post-operative appointment. [*Id.* at 1273]. Mr. Razo noted that his left hand was doing well. [*Id.*]. Dr. Fremling's treatment notes reflect that Mr. Razo was advised that he would not be able to use his left hand and arm for work for a minimum of two months. [*Id.*]. On July 19, 2010, during a subsequent post-operative appointment with Dr. Fremling, Mr. Razo's treatment records indicate that Mr. Razo "complain[ed] of pain in his hands, pain at the palm, and intermittent numbness in his fingertips which he did not have immediately postoperatively." [*Id.* at 1271]. Dr. Fremling noted that upon examination, "his range of motion [wa]s good." [*Id.*].

On September 30, 2010, Mr. Razo visited Dr. Wagner for a follow-up appointment and underwent an additional electrodiagnostic study of his right upper extremity. [*Id.* at 1276-78]. The results of the study indicated right carpal tunnel syndrome "new compared to a prior EMG of June 2009" and stable or "perhaps slightly improved" right ulnar neuropathy. [*Id.* at 1276].

On November 15, 2010, Mr. Razo visited Dr. Fremling complaining of tenderness in his left palm and numbness in his right little finger. [#10-14 at 1358]. Dr. Fremling's treatment notes reflect that although examination results reflected recurrent right carpal tunnel syndrome, the results did not call for further treatment unless Mr. Razo became symptomatic. [*Id.*]. As to Mr. Razo's right little finger, the treatment notes reflect that the condition had not improved after prior decompression surgery, indicating that the nerve had been damaged by compression neuropathy prior to operation. [*Id.*]. The treatment notes also reflect Dr. Fremling's opinion that maximum medical improvement might not be realized until two years after decompression surgery. [*Id.*]. On October 10, 2011, Mr. Razo returned to Dr. Fremling and complained of numbness and pain in his right little finger and right ring finger. [*Id.* at 1419]. The treatment notes reflect a recent nerve conduction study indicating recurrent cubital tunnel syndrome. [*Id.*].

15

A number of treatment options were addressed, including "doing nothing." [*Id.*]. Two months later, Mr. Razo visited Dr. Fremling and complained of cramping in his hands on December 19, 2011. [*Id.* at 1418]. Examination results indicated continued numbness in the ulnar nerve distribution in Mr. Razo's right hand. [*Id.*]. Dr. Fremling stated that, despite multiple nerve decompressions, there had not yet been dramatic improvement in Mr. Razo's symptoms. [*Id.*].

On July 18, 2012, Mr. Razo visited Dr. Fremling, complaining of pain in his right elbow and his left hand. [#10-15 at 1568]. Steroidal therapy, which the treatment record notes indicate had been employed with success in the past, was provided. [*Id.*].

### B.      Plaintiff's Mental Health Impairments

Since at least June of 2008, there are indications that Mr. Razo suffered from an anxiety Disorder. [#10-11 at 879]. From April of 2009 through June of 2011, Mr. Razo was treated for mental health issues by Boulder Mental Health. [#10-15 at 1467-1536]. These treatment records reflect that Mr. Razo's mental health functioning was correlated with domestic issues. [*Id.*]. Mr. Razo also testified that his anxiety had worsened since 2010 mostly due to his concerns about his physical condition. [#10-2 at 115; #10-3 at 174].

### ANALYSIS

### I.      ALJ's Declination to Give Dr. Fremling's October 2009 Opinion Controlling Weight

Plaintiff contends that the ALJ erred by failing to give controlling weight to Mr. Razo's treating physician Dr. Fremling's October 19, 2009 "Medical Opinion Re: Ability to Do Work-Related Activities." [#16 at 23-27, #10-13 at 1175-77]. The ALJ instead gave greater weight to the subsequent opinions of non-treating physicians, including testifying medical examiners Dr. Rack and Dr. Greenberg. [#10-2 at 123-125]. The ALJ's decision expressly found that Dr. Fremling's opinion was entitled to "little weight" because it was "inconsistent with the evidence

as a whole and other opinions in the record." [*Id.* at 122].   The ALJ also noted that Dr.

Fremling's October 2009 opinion was provided only three months after Mr. Razo's

decompression surgery in July of 2009.  [*Id.*].

"Under the regulations, the agency rulings, and [Tenth Circuit] case law, an ALJ must

'give good reasons in [the] notice of determination or decision' for the weight assigned to a

treating physician's opinion."  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)

(quoting 20 C.F.R. § 404.1527(d)(2)) (additional citation omitted).  Moreover, the decision

"'must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Id.*

(quoting SSR 96–2p, 1996 WL 374188, at *5).

Here, the ALJ's decision provides express findings as to the weight given to Dr.

Fremling's October 19, 2009 opinion (*i.e.*, little), and provides good reasons in support.  Put

simply, Dr. Fremling's October 2009 opinion was provided so soon after Mr. Razo's July 2009

decompression surgery that the degrees of limitation reflected in Dr. Fleming's opinion could

well have arisen from the surgical intervention itself, and might be expected to dissipate as Mr.

Razo continued to recover.  Indeed, Dr. Greenberg testified in 2012 that the record as a whole—

including medical records reflecting Mr. Razo's recovery subsequent to the fall of 2009—

established as much.  [#13 at 1614-15].  The opinions of Dr. Graesser and Dr. Rack, which were

also provided several months (in the case of Dr. Graesser) or more than a year after (in the case

of Dr. Rack) October of 2009, also found less restrictive limitations as Mr. Razo apparently

continued to recover from upper extremity surgical interventions.   [#10-13 at 1235] (Dr.

Graesser opining in February of 2010 that Mr. Razo could lift up to 50 pounds occasionally and

that "[h]e has no limitations on my examination in ambulation, bending, crawling, stooping,

crouching or balancing"), [#10-3 at 203] (Dr. Rack testifying in February of 2012 that "the nature of the abnormality within the nervous system per se, does not of itself extend to such a great degree that one would consider the patient unable to function in a fairly reasonable way").

A treating physician's opinion is entitled to controlling weight "if it is not inconsistent with other substantial evidence in the record." *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995). Because Dr. Fremling's October 2009 opinion included functional limitations that were inconsistent with substantial evidence in the record of subsequent improvement—including subsequent opinions by other physicians who evaluated medical record evidence post-dating Dr. Fremling's October 2009 opinion—the ALJ did not err in declining to give Dr. Fremling's opinion controlling weight. *See, e.g.*, *Redmon v. Colvin*, No. 11 C 8526, 2014 WL 2566514, at *5-*6 (N.D. Ill. June 4, 2014) (finding subsequent evidence of medical improvement provides good reason not to give controlling weight to treating physician opinion).

## II.     ALJ's Findings as to Claimed Non-Exertional Limitations

### A.     ALJ's Findings as to Pain

Plaintiff argues that the ALJ erred by purportedly failing to "specifically address Mr. Razo's pain as a disabling factor in and of itself." [#16 at 28-29]. But the ALJ's expressly found that Plaintiff's allegations of disabling pain were not credible, based on evidence in the Record that Plaintiff exaggerated his symptoms of pain because of his apparent addiction to opiates, and engaged in other drug-seeking behavior. [#10-2 at 115-118]. Plaintiff asserts the ALJ erred because "the ALJ never conducted a Luna analysis of Mr. Razo's pain." [#16 at 29]. However, the "mere absence of a rote recitation of the *Luna* factors [set forth in *Luna v. Bowen*, 834 F.2d 161, 165–66 (10th Cir.1987)]" is not error by itself. *Jimison ex rel. Sims v. Colvin*, 513 F. App'x. 789, 796 (10th Cir. 2013) (unpublished).

18

The ALJ specifically noted instances where Plaintiff's reports of pain were not correlated with clinical findings. For instance, in July 2007, Plaintiff complained of persistent knee pain secondary to his gout [#10-2 at 115 citing #10-12 at 1047], but the clinical examination demonstrated a flex of approximately 90 degrees. [*Id.*]. A later x-ray noted by the ALJ demonstrate no acute deformity or abnormality. [#10-2 at 116 citing #10-12 at 1045]. The ALJ also engaged in a detailed discussing regarding his credibility determination. [#10-2 at 115-119]. Based on the briefing before it, the court can discern no error in the ALJ's determination that Plaintiff's pain was not disabling.

### B.     Medical Appointments

Plaintiff argues that the ALJ erred in failing to make express RFC findings as to Plaintiff's ability to attend work consistently, given Plaintiff's testimony that he regularly attended several medical appointments for around several hours per week. [#16 at 29]. Yet Plaintiff points to no evidence in the record that demonstrates that he is required to attend several medical appointments around several hours per week, every week, and the ALJ specifically found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were not consistent with the above-residual function capacity assessment. [#10-2 at 115]. The ALJ further noted that Dr. Wagner, one of Mr. Razo's treating physicians, did not address any impairment that limited his ability to work, and only indicated that he believed Mr. Razo was unable to work for up to six months starting in September 2012. [*Id.* at 124 citing #10-15 at 1550-52]. In addition, while Dr. Wagner noted that Mr. Razo was "unable to work" pending further treatment including 'massage therapy, acupuncture, and meds" [#10-2 at 124 citing #10-15 at 1550], the ALJ assigned Dr. Wagner's opinion little weight as it "provides no functional limitations that would result in the claimant

being 'unable to work.'" [#10-2 at 124]. Indeed, Dr. Wagner did not specify the frequency of the treatments recommended to Plaintiff. [#10-15 at 1550].

A claimant has the burden to prove his RFC at step 4 of the sequential evaluation. *See Reno v. Astrue*, Civil Action No. 12-1121-JAR, 2013 WL 474298, at *1 (D. Kan. Feb. 7, 2013) (citing *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir.1993)). It was Mr. Razo's burden to show the frequency of his healthcare appointments and any disruption they would cause, and he simply has failed to establish that the ALJ failed to properly account for either the frequency or the disruption in his determination of Plaintiff's RFC. Accordingly, this court finds that any failure by the ALJ to account for his ability to attend work due to his medical appointments does not require reversal because there is no evidence that the condition imposed any restriction on his functional capabilities as reflected in the RFC. *See Morin v. Colvin*, No. 4:14-cv-000769-NKL, 2015 WL 4928461, *9-*10 (W.D. Mo. Aug. 18, 2015).

**C.      ALJ's Consideration of Plaintiff's Obesity**

Plaintiff contends that the ALJ failed to account for his obesity in the RFC, and a proper consideration would have resulted in greater restrictions and a finding that Mr. Razo was disabled. [#16 at 29]. The ALJ properly noted that Plaintiff had been diagnosed as morbidly obese, and therefore, Social Security Ruling 02-1p, 2000 WL 628049, required the ALJ to assess the impact of that obesity. At step 2, the ALJ must decide whether the claimant's obesity is severe either alone or in combination with other impairments. *See Wrenn v. Astrue*, No. 11–981–HE, 2012 WL 5289417, *6 (W.D. Okla. Sept. 12, 2012). The ALJ did find that Mr. Razo suffered from a severe impairment of morbid obesity at step 2. [#10-2 at 108]. At step 3, the ALJ found there was no listing for morbid obesity, and that claimant's obesity in conjunction

with other impairment did not indicate that his obesity met or equals a listed impairment. [*Id.* at 113].

If a claimant is obese, the ALJ should discuss the "possible ramifications" of the claimant's obesity" as to other impairments. *Howard v. Barnhart*, 379 F.3d 945, 948 (10th Cir. 2004). In the instant case, the ALJ's decision provides that the "medical source opinions" relied upon "included the effects of claimant's obesity in the limitations provided." [#10-2 at 120]. The RFC determined by the ALJ indicates that Mr. Razo can perform sedentary work; can lift and carry up to 10 pounds occasionally; can stand and walk no more than hour at a time; and for no more than four hours in an eight hour day. [*Id.* at 113-14]. While Plaintiff asserts that it was error for the ALJ not to account for obesity in his determination of Mr. Razo's RFC, "the problem with this argument is that there is no record of any functional limitations" from Mr. Razo's obesity or any of his impairments potentially caused or exacerbated by his obesity that are not accounted for within the RFC. *See Jimison*, 513 F. App'x at 798. Indeed, apart from his bald assertion that a proper assessment of his obesity would have resulted in additional limitations and a finding of disability, Mr. Razo points to no record citation to support a conclusion that his obesity would further limits his ability to function in a manner not already accounted for through the RFC. *See Rios v. Astrue*, 848 F. Supp. 2d 1283, 1289-90 (D. Colo. 2012). Therefore, the court concludes that the ALJ did not err. *See Jimison*, 513 F. App'x at 798; *Wood v. Colvin*, No. CIV-12-1395-M, 2014 WL 837149, *10 (W.D. Okla. Mar. 4, 2014).

### III. ALJ's Findings as to Mr. Razo's Social Functioning

The ALJ's decision gave "significant" weight to Dr. Moore's opinions with respect to Mr. Razo's mental impairments. [#10-2 at 124]. Dr. Moore testified that Mr. Razo's social functioning with supervisors, co-workers, and the general public would be at least moderately

limited, but that these social limitations would be greatest in situations where Mr. Razo was "confronted about his substance abuse" arising from his addiction to pain medication. [*Id.*; #10-3 at 211]. The ALJ declined to include any specific limitations on Mr. Razo's social functioning in the ALJ's RFC determination, finding that Mr. Razo's substance abuse was in remission, and that Mr. Razo's own testimony does not indicate "any difficulty getting along with others." [#10-2 at 124]. However, the ALJ did note that "[r]egarding the claimant's mental limitations, the undersigned has taken into account some of the claimant's allegations regarding his pain and anxiety. Accordingly, giving the claimant the benefit of the doubt despite multiple notations of pain exaggeration and malingering, the undersigned has limited the claimant to understanding, remembering and carrying out simple instructions, despite Dr. Moore's opinion that he could perform all types of tasks." [*Id.* at 125].

The Commissioner argues that the ALJ's finding that Mr. Razo's social impairments would pose no limitation on his RFC is supported by substantial evidence. [#19 at 18-19]. "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation and quotation omitted). In discussing whether Mr. Razo's impairments or combination of impairments met the severity of one of the listed impairments, the ALJ noted Dr. Moore attributed limitations with respect to social functioning were predominantly related to a divorce and custody dispute with his ex-wife. [#10-2 at 109]. The ALJ also noted that it was the opinion of Dr. Moore that Mr. Razo could understand, remember and carry out all types of instructions, without limitation. [*Id.*]. The ALJ also noted that The ALJ further noted that Plaintiff's anxiety had been controlled by medication, citing to Dr. Moffat's notes. [*Id.* citing #10-9 at 676 ("He has been doing relatively well with regard to

22

the anxiety issues")].  The ALJ noted that by April 2008, Dr. Fanestil, one of Plaintiff's treating physicians, was reflecting Mr. Razo's self-report that he was "doing good."  [#10-2 at 109].  He also notes that as of May 2008, Plaintiff reported that he was "okay" and was looking for jobs.  [*Id.* at 110 citing #10-11 at 973].  The ALJ noted that Plaintiff had not indicated any difficulty getting along with others [#10-2 at 124].  That conclusion is supported by the ALJ's discussion regarding Mr. Razo's self-report that he was able to drive his kids to and from school on a daily basis [*id.* at 110] and Plaintiff's testimony provided at the hearings on May 4, 2015 and October 19, 2012.  [*Id.* at 114-15].  The ALJ also noted that Mr. Razo had testified that he had stopped abusing his narcotic medication after his kidney stone was removed.  [*Id.* at 115].

Despite Plaintiff's arguments, Plaintiff fails to point to any evidence in the record that supports more specific limitations to his social functioning that are not accounted for in the RFC.  He fails to identify any testimony that he provided to the ALJ to demonstrate that he had limitations to his social functioning.  [#16 at 30-32].  Indeed, most of Plaintiff's arguments amount to speculation as to what, if any, social restrictions Mr. Razo may had, without any citation to the record of medical evidence that the ALJ improperly disregarded.  [*Id.*].  And contrary to Plaintiff's argument that the ALJ's determination that Mr. Razo's social functional limitations are moot were based solely on the ALJ's interpretation of one sentence in Dr. Moore's testimony, the ALJ cites to numerous instances in the record where Plaintiff and his treating physicians were reporting that his anxiety was under control and his drug-seeking behavior had resolved, as discussed above.  Therefore, this court finds that the ALJ did not err by failing to assign specific social functioning restrictions in the determination of Mr. Razo's RFC.

## IV.     The ALJ's Determination at Step 5

Plaintiff contends that at step 5, the ALJ erred because he failed to:   (1) obtain a reasonable explanation for a conflict between the VE's testimony and the *Dictionary of Occupational Titles* related to the limitations associated with "sedentary work"; (2) precisely account for claimant's impairments in the hypothetical questions posed to the VE; and (3) failed to account for the frequent manipulation necessary to perform the jobs identified by the VE. [#16 at 32].  The Commissioner argues that the ALJ reasonably relied upon the VE's response to the hypothetical questions, and even if the court found error, any error is harmless because at least two of the jobs that the VE identified were sedentary in nature.  [#19 at 19-20].

At step 5 of the sequential analysis, the ALJ must determine whether there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  If not, the claimant is determined to be disabled.  If there are jobs that exist in significant numbers that appropriately account for Plaintiff's age, education, work experience, and RFC, then the claimant is determined to be not disabled.  The burden rests upon the Commissioner at this stage. *Fischer–Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, (1987).

In reviewing the ALJ's determination, keeping in mind that the court's role is not to reweigh the evidence, the court finds no error.  Contrary to Plaintiff's argument, the ALJ specifically asked the VE whether her testimony differed from the DOT. [#10-3 at 192].  The VE responded by explaining that some of the answers are not covered by the DOT, and she based her answers upon her experience, training, and education.  [*Id.*].  Nothing in the ALJ's questions or the VE's responses appear ambiguous about the additional walking and standing limitations, despite the definition of "sedentary work."  The ALJ found that Mr. Razo could not perform a

full range of sedentary work.  [#10-2 at 126].  In posing questions to VE Christianson, the ALJ

did not instruct VE Christianson to consider a full range of sedentary work for Mr. Razo.

Instead, the ALJ specifically inquired about Plaintiff's particular limitations:

> **ALJ:**   I'd like you to now assume another individual who could -- of the same
> age, education and work experience as the claimant who could lift and carry no
> more than 10 pounds. Who could stand and walk no more than one hour at a time
> for a total of four hours during an eight hour workday.   The person could sit
> without limitation. The person could frequently use their upper extremities for
> work activities. The person would be able to understand, remember and carry out
> only simple instructions. Could such a person as I've just described perform work
> that you gave me in response to my first hypothetical?
>
> **VE:**   Okay. Your Honor, what I would say to that is I believe that that would
> eliminate all but the assembler, and that position, those numbers would be eroded
> up to 50 percent.
>
> **ALJ:**   Okay. So would there be other work such a person could perform?
>
> **VE:** One moment. Another example might be an addresser.  That DOT code
> number is 209.587-010. That is sedentary, SVP 2. And those jobs occur nationally
> at a rate of approximately 25,000, locally approximately 280. And let's see here,
> and another example might be a final assembler. That DOT code number is
> 713.687-018, sedentary, SVP 2. National numbers approximately 14,000, and
> locally approximately 150.

[#10-3 at 187].  The ALJ expressly noted in his decision that the VE stated that the assembler of

small products occupation would be eroded an additional 50% due to Mr. Razo's additional

standing and walking limitations, which were not covered by the DOT.  [#10-2 at 126].  Finally,

Plaintiff's final argument regarding his limitations regarding frequent manipulation is a recasting

of his argument regarding the ALJ's purported failure to properly account for his upper extremity

symptoms – and for the reasons above, the court is not persuaded that the ALJ erred when he

declined to include additional limitations in the RFC.

**CONCLUSION**

For the reasons stated herein, IT IS ORDERED that the decision of the Commissioner is

AFFIRMED.


DATED November 3, 2015                    BY THE COURT:


                                          s/ Nina Y. Wang
                                          Nina Y. Wang
                                          United States Magistrate Judge